# UNITED STATES DISTRICT COURT
for the
Middle District of Tennessee

| | |
|---|---|
| United States of America<br>v.<br>Karl Chandler, Jr.,<br>Jacquez McCoy,<br>Branelle Brooks<br><br>*Defendant(s)* | Case No. 24-mj-2010 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **January 4, 2024** in the county of **Davidson** in the **Middle** District of **Tennessee**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to possess with the intent to distribute a quantity of a mixture and substance containing fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 846. |
| 18 U.S.C. §§ 922(g)(1) and 924 | Possession of a Firearm by a Convicted Felon, in violation of Title 18, United States Code, Sections 922(g)(1) and 924. [Karl Chandler, Jr. only] |

This criminal complaint is based on these facts:

See attached 10-page Affidavit in Support of Complaint

☑ Continued on the attached sheet.

Mark Gonzalez - signed electronically
*Complainant's signature*

Mark Gonzalez, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 01/05/2024

*Judge's signature*

City and state: Nashville, Tennessee

Jeffery S. Frensley, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF COMPLAINT

## INTRODUCTION

Your Affiant, Mark Gonzalez, a federal agent with the United States Drug Enforcement Administration ("DEA"), being duly sworn, deposes and states as follows:

1. I am employed as a Special Agent with the DEA and have been so employed since May of 2021. I am currently assigned as a Special Agent in the Nashville District Office of the Drug Enforcement Administration ("DEA"). I am responsible for investigating crimes that involve the unlawful importation and exportation of illegal narcotics, the possession with the intent to distribute controlled substances, the distribution of controlled substances, the use of communication facilities to further these offenses, and the related crime of laundering monetary instruments, all in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, and 952, and Title 18, United States Code, Sections 1956 and 1957. Prior to my employment with DEA, I was a sworn police officer with the Hartford Police Department (HPD) in Hartford, Connecticut for approximately four years. During my tenure with HPD, I was involved in conducting narcotics investigations at the street level. I also participated in the execution of numerous other narcotics search warrants.

2. In conducting these drug investigations, I have used a variety of investigative techniques and resources, which include, but are not limited to, conducting physical and electronic surveillance, and managing the use of cooperating sources ("CS's") and informants. Through these investigations, my training and experience, and conversations with other Agents and law enforcement personnel, I have become familiar with the methods used by narcotics traffickers to safeguard their illegal narcotics, to distribute narcotics, and to collect and launder the proceeds of narcotics sales.

3. I have participated in debriefings of defendants, co-conspirators, informants, and witnesses who have had personal knowledge regarding major narcotics trafficking organizations, and I have participated in all aspects of drug investigations, including conducting surveillance, executing searches pursuant to court ordered search warrants, and executing arrest warrants. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification and investigation.

4. Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, state, national and international levels, including those involving the distribution, storage, and transportation of illegal narcotics and the collection of money that constitutes the proceeds of narcotics-trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities. I know that drug traffickers often have multiple cellular telephones in order to separate nefarious activities from their personal business, as well as thwart detection from law enforcement by having multiple telephone numbers at their disposal. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection. I am familiar with the common appearance, packaging, and texture of controlled substances.

5. Based upon my training and experience in narcotics investigations, I also know that drug traffickers use commercial shipping services to send narcotics and proceeds of illegal narcotics distributions to and from the Middle District of Tennessee. These shipments, which are generally disguised as commonplace items to hide their illicit nature, come to Tennessee from known narcotics source areas, including border states such as Arizona.

6. The information in this affidavit is based upon my personal knowledge as well as information that I have received from other law enforcement sources. I am familiar with the facts

2

and circumstances of this investigation through DEA and other law enforcement personal participation; from discussions with other DEA agents and other law enforcement; from my discussions with witnesses involved in the investigation; and from my review of records and reports relating to the investigation.

7. This affidavit does not contain all the information known to me regarding this investigation but only what I believe to be sufficient facts for the sole purpose of establishing probable cause for the arrest of Karl CHANDLER, JR. ("CHANDLER"), Jacquez MCCOY ("MCCOY"), and Branelle BROOKS ("BROOKS"). Therefore, I have not set forth each and every fact that I have learned during the course of this investigation. I am not relying on facts outside of this affidavit to reach my conclusion that an arrest warrant should be issued, nor do I request that the Court rely on any facts not set forth herein.

8. This affidavit is presented in support of an arrest warrant for and complaint charging that, on or about January 4, 2024, in the Middle District of Tennessee and elsewhere, CHANDLER, MCCOY, and BROOKS knowingly and intentionally conspired and agreed with each other and others to possess with the intent to distribute a quantity of a mixture and substance containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 846. In addition, on or about January 4, 2024, CHANDLER, knowing he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed, in and affecting commerce, a firearm, to wit: an HS Produkt/Springfield Hellcat 9x19mm pistol, in violation of Title 18, United States Code, Sections 922(g)(1) and 924.

## **PROBABLE CAUSE**

### Background

9. On January 2, 2024, a confidential source informed DEA Agents in Phoenix, Arizona, someone had shipped a suspicious package from Phoenix earlier that day to an address

in Old Hickory, Tennessee, through the United Parcel Service ("UPS"). The package had a tracking number of [1Z58941V1590627320]. The individual who sent the package paid UPS approximately $500 for UPS to ship the package (a "blow up mattresses 2x") overnight so it could be delivered in Tennessee during the early morning hours on the following day. DEA Agents in Phoenix contacted DEA Agents in Nashville, Tennessee, and relayed information regarding the package.

10. DEA and the Metropolitan Nashville Police Department ("MNPD") researched the sender's and recipient's information listed on the package through law enforcement and open-source databases. Agents learned the sender was a deceased person, and Agents believed the package was sent using a fraudulent name. Agents researched the recipient's address and confirmed it was a residential address in Davidson County, Tennessee. However, Agents did not find any evidence that the listed recipient was affiliated with that address in law enforcement or open-source databases.

State Search Warrant and Package Delivery

11. The package was originally scheduled for an early morning delivery to the recipient address on January 3, 2024. However, it was delayed in transit and rescheduled for delivery on the morning of January 4, 2024. When the package arrived at a UPS facility in Nashville on January 4, 2024, an MNPD Detective and his K9 partner ("Bane") went to the UPS facility. "Bane" is a United States Police Canine Association certified drug detection dog trained to alert to specific narcotic odors produced from cocaine, heroin, marijuana, and methamphetamine during "free air" sniffs. The MNPD Detective used "Bane" to conduct a "free air" sniff on the package shipped from Arizona to Tennessee and other parcels of similar size. "Bane" positively alerted only on the package. Following the positive alert, Agents obtained a state search warrant to search the package.

4

12. When Agents executed the search warrant and opened the package, they discovered two boxes, both of which appeared to be air mattress boxes based upon their markings. The first box contained a deflated air mattress. Concealed inside that air mattress was a large vacuum-sealed bag of blue pills. The pills, which numbered in the thousands, were stamped "M" on one side and "30" on the other. Agents found another deflated air mattress in the second box. Concealed inside the second air mattress was another large vacuum-sealed bag of blue pills. Those pills were also stamped "M" on one side and "30" on the other.

13. Based upon their training, knowledge, and experience, Agents immediately recognized the blue pills as consistent with counterfeit M30 Oxycodone pills. Agents removed the pills from their original packaging and replaced them with fake narcotics and a tracking device. Agents conducted a field test on some of the pills, and the test confirmed that the pills contained fentanyl and other substances. Based upon my training and experience, I know fentanyl to be a Schedule II controlled substance under the United States Controlled Substances Act. The combined weight of the blue M30 pills inside of the package was 6.27 kilograms. Agents placed the modified package back in transit to be delivered to the recipient's residential address in Old Hickory.

14. Agents established surveillance near this residence and used an undercover detective to place the package on the front porch of the residence. About six minutes later, around 7:36 a.m., agents observed a blue Toyota Corolla with an Alabama license plate park in front the residence. A black male wearing a white hoodie exited the passenger's side of the Corolla, picked up the package, and placed it in the rear passenger's side of the Corolla. The Corolla then pulled away. Investigators followed the Corolla to the Hyatt Place Nashville Airport Hotel located at 721 Royal Parkway, Nashville, Tennessee.

5

## Arrest of CHANDLER, MCCOY, BROOKS, and Individual A

15. Agents observed the Corolla back into a parking space at the hotel. A black male wearing a blue sweatshirt, later identified as CHANDLER, exited the driver's side of the Corolla. The black male wearing the white hoodie, later identified as MCCOY, exited the passenger's side of the Corolla. MCCOY retrieved the package from the Corolla and entered the hotel with the package and CHANDLER.

16. Agents established a perimeter around the hotel in anticipation of MCCOY and CHANDLER discovering the sham material and tracking device. Moments later, they observed CHANDLER exit the hotel and walk towards the Corolla with a black female, later identified as BROOKS. Agents then took BROOKS and CHANDLER into custody without incident.

17. Agents canvassed the hotel for MCCOY. A short time later, Agents learned a hotel guest had been locked out of his room. An Agent was present as hotel management escorted the guest to his room. When the door was opened, the hotel guest found two unknown individuals in of his room, one of which was MCCOY. The Agent recognized MCCOY, based on the description given by other Agents, and detained him outside of the room without incident. The Agent announced himself and instructed the other trespasser to come out the room. A man ("Individual A") subsequently exited the room and was also detained without incident.

18. Agents conducted a protective sweep of the hotel room and confirmed no one else was in the room. Agents informed MCCOY and Individual A of their *Miranda* rights and asked them where their phones were located. MCCOY said he may have dropped his phone in the hallway, and Individual A said that he did not know where his phone was. Agents searched the hotel room where they had been found, and located two broken iPhones in the closet. Neither MCCOY nor Individual A claimed ownership of either phone.

## Interview of CHANDLER

19. Agents informed CHANDLER of his *Miranda* rights. In a post-*Miranda* interview, CHANDLER stated that on Monday or Tuesday of the prior week (December 25 or 26, 2023), he drove to Phoenix, Arizona with approximately $10,000 in United States Currency. CHANDLER stated he and others purchased the seized pills from multiple sources of supply in Phoenix. CHANDLER said that they arranged for the pills to be shipped to Nashville, and then he and others traveled to Nashville. CHANDLER said that on the morning of January 4, 2024, he retrieved one of the shipped packages that he believed contained the purchased pills, and he planned to distribute the pills. CHANDLER said that he and others purchased the pills for approximately 10 cents a pill, and the pills could be sold for approximately two dollars each.

## Recovery of the Firearm

20. CHANDLER gave Agents consent to search the Corolla which Agents observed him driving earlier that day. CHANDLER was also in possession of the keys at the time of his arrest. Upon searching the Corolla, Agents found a HS Produkt/Springfield Hellcat 9x19mm pistol bearing serial number BY224595 in the passenger's side rear seat. The firearm was loaded and had a round of ammunition in the chamber. CHANDLER said the handgun belonged to him and he carries it with him. CHANDLER also acknowledged being a convicted felon. Agents confirmed through public records that CHANDLER has at least two felony drug convictions in Alabama.

21. Agents contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") regarding the firearm recovered from the Corolla. An ATF special agent, who has the training and experience necessary to conduct interstate nexus reviews, examined photographs of the recovered gun and determined it is a "firearm" within the meaning of Title 18, United States Code, Section, 921(a)(3). The ATF agent also determined that the firearm had not been

7

Case 3:24-mj-02010   Document 1   Filed 01/05/24   Page 8 of 11 PageID #: 8

manufactured in the State of Tennessee, and therefore had traveled in and affected interstate commerce prior to its possession by CHANDLER on January 4, 2024.

22. CHANDLER gave Agents consent to search his cell phone and this search revealed a message with a photograph of the tracking identification number for the package. Investigators also found a screen shot photograph of the package's intended address in Old Hickory, Tennessee.

Interview of MCCOY

23. Agents also advised MCCOY of his *Miranda* rights. In a post-*Miranda* interview, MCCOY stated that his "job" is to ship packages. However, he denied knowing the contents of any of those packages. When asked how much he was paid for the job, MCCOY said that he did not know and that he had not been paid yet. MCCOY further explained that he drove to a UPS store in Phoenix, Arizona, with another individual, and that other individual shipped two different packages. When asked about the second package, MCCOY stated that it was going to the same address as the prior package that Agents had recovered, and that it should be the "same" as the prior package. MCCOY also denied knowing the contents of the second package. MCCOY admitted picking up the package from the residence in Old Hickory that morning (as observed by agents).

24. Agents asked MCCOY why he went into a stranger's hotel room. MCCOY stated that when he saw the contents and the tracker in the package, he decided to flee the area and ran into the open hotel room. MCCOY and Individual A had been found in this room with two broken iPhones. I know from my training and experience that drug traffickers commonly attempt to destroy evidence of their involvement in drug trafficking when they believe they are about to be arrested.

### Interview of Individual A

25.     Agents advised Individual A of his *Miranda* rights. In a post-*Miranda* interview, Individual A said that he was not involved in the offenses and should be released.

### Interview of BROOKS

26.     Agents advised BROOKS of her *Miranda* rights. In a post-*Miranda* interview, BROOKS indicated that she knew blue pills were supposed to be picked up that day. BROOKS stated that once the box was open and the tracker was revealed, she and others ran out of the hotel room. BROOKS said that she, together with others, drove to Phoenix, Arizona, from Alabama in a rented Chevy Tahoe. After they arrived in Phoenix, BROOKS said, she and others met with two separate individuals and received a total of two packages of pills and a small amount of crystal methamphetamine from them. BROOKS stated that she was not present when the pills were dropped off at UPS; however, she knew about a second package shipped to the Old Hickory residence. BROOKS stated that she and others returned from Phoenix on January 3, 2024, and were staying at the Hyatt Place Nashville Airport Hotel.

27.     Additionally, a consent search of BROOKS' cell phone yielded a text message received on December 28, 2023 asking "you got anymore of them perks." Based upon my training and experience, I know "perks" to be street slang for oxycodone pills. The message is also consistent with the types of communications that narcotics traffickers receive from their buyers. Further, the word "anymore" indicates that BROOKS had distributed to this individual on at least one occasion prior to her receipt of the message.

## CONCLUSION

28.     Based upon my training and experience, and the totality of the facts described above, I believe there is probable cause that, on or about January 4, 2024, in the Middle District of Tennessee and elsewhere, CHANDLER, MCCOY, and BROOKS knowingly and intentionally

conspired and agreed with each other and others to possess with the intent to distribute a quantity of fentanyl, in violation of Title 21, United States Code, Section 846. Furthermore, there is probable cause that on or about January 4, 2024, CHANDLER, knowing he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed, in and affecting commerce, a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924.

10

Case 3:24-mj-02010 Document 1 Filed 01/05/24 Page 11 of 11 PageID #: 11